IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION NO. |
| v. | ) | 2:19cr127-MHT |
| | ) | (WO) |
| ULYSSES OLIVER, JR. | ) | |

OPINION

Defendant Ulysses Oliver, Jr. pleaded guilty to an information charging him with two counts of deprivation of rights under color of law, in violation of 18 U.S.C. § 242.  At sentencing, the court granted a downward 'variance' of seven months, for a sentence of 30 months of imprisonment.  It writes now to explain in more detail its decision regarding the variance.


I.

The charges here arise from a February 2019 incident in which Oliver, then employed as a Correctional Sergeant with the Alabama Department of Corrections (ADOC), beat two incarcerated men while their hands were cuffed behind their backs.  One of Oliver's coworkers had caught the

men scaling a fence outside the Elmore Correctional Facility in order to retrieve a stash of contraband, and had taken them to Oliver's supervisor, Lieutenant Willie Burks, III, who had put them in handcuffs and brought them to an observation room.  Oliver, upon learning what the men had done, flew into a fit of rage.  Without consulting his colleagues, he stormed into the observation room, dragged one of the men into a hallway, shoved him against a wall, knocked him to the floor, and beat him with his fists and feet, and a collapsible baton. Then he did the same to the other man.  Lieutenant Burks and two other correctional officers stood by and watched. They made no effort to stop him.  Instead, Lieutenant Burks remarked, simply, "[I]t's fair."  Trial Transcript, Vol. II at 38, *United States v. Burks*, No. 2:19cr344-MHT (M.D. Ala. May 2, 2022), ECF No. 234.

The men were later brought to ADOC's healthcare unit, where it was determined that they had sustained serious blunt-force trauma to their backs, stomachs, legs, arms,

2

and heads.  One suffered broken bones, muscle strains, and the loss of mobility in his wrist; the other continues to suffer from chronic back and arm pain and migraine headaches.

## II.

At sentencing, the court found that Oliver's criminal history category was I and that his total offense level, before any departure, was 28, for a U.S. Sentencing Guideline range of 78 to 97 months.  *See* United States Sentencing Guidelines Manual ch. 5, pt. A (U.S. Sentencing Comm'n 2021).

The government moved for a seven-level downward departure for substantial assistance.  *See id.* at § 5K1.1.  In support of such a large departure, the government offered evidence that Oliver had been exceptionally cooperative at all stages of the investigation of his offense conduct.  Oliver had called the warden to self-report, over Lieutenant Burks's

3

objections, immediately after beating the two men.  Had he not done so, the government lawyer stated, it is likely that his conduct never would have been prosecuted. Within days of the incident, he met with an investigative team for the government, and was so eager to confess wrongdoing that, in his initial interview, he began accepting responsibility even before the agents finished introducing themselves.  Within a week of being charged, he pleaded guilty.  And when the government prosecuted Lieutenant Burks, Oliver offered his complete assistance, including testifying in front of a grand jury and at trial.  In light of this evidence, the court granted the government's motion, bringing Oliver's offense level to 21, and his sentencing range to 37 to 46 months.  *See id.* at ch. 5, pt. A.

    The court then turned to Oliver's motion for a variance.  The parties presented evidence, and the court heard argument.  The evidence reflected that Oliver has post-traumatic stress disorder (PTSD) caused by unsafe

**4**

working conditions resulting from ADOC's failure to provide an adequate number of staff for its prisons. It also reflected that Oliver's PTSD contributed to his offense conduct; that ADOC had failed to screen him for mental-health issues; and that his supervisors had failed to give him the support that he needed, even when he indicated that he needed help. Based on the evidence, the court determined that, despite the atrocity of Oliver's conduct, a variance was warranted. It now elucidates its reasoning below.

## A.

Prior to sentencing, Oliver was evaluated by a psychologist, Dr. Peggy Flanagan, who diagnosed him with major depressive order, alcohol-use disorder, and PTSD.

Dr. Flanagan determined that Oliver had experienced extensive childhood abuse that left him predisposed to mental-health issues. His parents divorced when he was three, and his mother remarried almost immediately. Both

his father and stepfather were alcoholics. His mother singled him out among his siblings for emotional abuse, telling him often that he would amount to nothing and would be dead soon or else in jail, and refusing to buy him school supplies or presents on holidays. His mother and his stepfather also beat him, often and severely, with belts, shoes, switches, and electrical cords. He reported wanting to kill himself as a child, explaining that: "I was tired. I thought no matter what I did I was wrong. I could never get it right. I felt like I was a burden." Psychological Evaluation (Doc. 94) at 5.

Oliver's mental-health and substance-abuse problems, however, did not "coalesce," according to Dr. Flanagan, "until he was sustaining mounting stress associated with his work" at ADOC. *Id.* at 11. Oliver began working at ADOC in 2009, after spending the years following his high-school graduation working in manufacturing and trucking. He applied for the position because he had heard that it paid well, and because he needed money to

**6**

support his young family.  The department did not screen
him for indicia of mental-health issues before offering
him the job.

The facility to which Oliver was eventually assigned,
Elmore Correctional Facility, is woefully understaffed.
*See* Psychological Evaluation (Doc. 94) at 7.  In his
interview with Dr. Flanagan, Oliver explained that this
understaffing has led to an "increase in drug
trafficking, fights, stabbings, gangs, and other elements
of violence."  *Id.**

---

\* In *Braggs v. Dunn*, which addressed ADOC's
constitutionally inadequate provision of mental-health
care, the court surveyed the effects of ADOC's
understaffing at length.  *See Braggs v. Dunn*, 257 F.
Supp. 3d 1171, 1193-1200 (M.D. Ala. 2017) (Thompson, J.);
*see also Braggs v. Dunn*, 562 F. Supp. 3d 1178, 1222-30
(M.D. Ala. 2021) (Thompson, J.).  It found understaffing
to be a "persistent, systemic problem that leaves many
ADOC facilities incredibly dangerous and out of control,"
*Braggs*, 257 F. Supp. 3d at 1198, and, as Oliver described
to Dr. Flanagan, "a major contributing factor to the
ongoing and excessively high levels of contraband, inmate
drug use, and inmate-on-inmate violence" in ADOC's
facilities, *Braggs*, 562 F. Supp. 3d at 1226.

These conditions had a direct impact on Oliver's mental health and, according to Dr. Flanagan, were most likely the cause of his PTSD. Oliver was placed on a team tasked with intervening in incidents of violence. As those incidents mounted, Oliver suffered "increasing stress and trauma associated with fears of being harmed or killed at work," *id.* at 8, developed "paranoia towards others" and an "exaggerated startle response," and began "always having to have his back to walls [and] constantly tracking the physical movements of others," *id.* at 12. As he described it to Dr. Flanagan:

> "I got to the point it was like, Lord, Jesus, how is this going to turn out today?  Am I going to come back home?  Not only for myself but for the other officers also.  I know I keep throwing them in there, but as a supervisor I took it on me, so they could get home safely.... I couldn't turn it off, my mind would not stop thinking about that job.  I couldn't rest ... I started drinking heavily to try to shut it down.  I wasn't able to sleep because I was always so wired up and I didn't realize what was going on."

*Id.* at 8.

Oliver's wife and his wife's aunt, both of whom testified at sentencing, offered comments that supported what Oliver had expressed to Dr. Flanagan, namely, that his mental-health problems were a direct result of his experience working at ADOC. His wife explained that Oliver "didn't acquire his PTSD overnight," but rather over years working in ADOC's understaffed facilities. Rough Draft Sentencing Transcript at 18, April 8, 2022. And his wife's aunt, with whom Oliver is close, recounted becoming so alarmed by the apparent toll that Oliver's working conditions inflicted on him that she urged him, repeatedly, to take time off to convalesce. Oliver rebuffed her, explaining, tragically, that he could not take time off because his fellow officers so desperately lacked support.

### B.

In addition to indicating that Oliver's working conditions at ADOC caused him to develop PTSD, the

**9**

evidence in this case made clear that Oliver's PTSD contributed to his offense conduct. Dr. Flanagan found that his PTSD caused him to suffer "marked alterations in arousal or reactivity associated with ... traumatic events." Psychological Evaluation (Doc. 94) at 14. She explained that such reactivity often manifests in "irritable behavior and angry outbursts (with little or no provocation) typically expressed as verbal or physical aggression towards people or objects," *id.* (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 272 (5th ed. 2013)), and that "[i]t is possible to conceptualize Mr. Oliver's entire offense as an expression of this symptom," *id.* Oliver's own description of the incident was entirely consistent with this hypothesis: as Dr. Flanagan recounted, Oliver explained to her that, upon learning that his two victims had attempted to smuggle contraband into the prison, he "immediately and erroneously saw them as entirely responsible for the repeated traumas and dangers" that

10

he had endured while working at ADOC.  *Id*.  He developed
"tunnel vision," and his thoughts became "a blur."  Trial
Transcript, Vol. II at 159, *United States v. Burks*, No.
2:19cr344-MHT (M.D. Ala. May 2, 2022), ECF No. 234.
"[A]ll the fights, the drugs, the stabbings, the inmates
running scared for their lives, the parents calling,
everything I've dealt with in that situation," he
explained, "I took it out on those two inmates."
Psychological Evaluation (Doc. 94) at 12.

Dr. Flanagan also pointed to evidence that, at the
time of the offense, Oliver was under acute stress that
may have exacerbated the symptoms of his PTSD.  The day
before the incident, Oliver had reported to his captain
and the warden at Elmore that he was "overwhelmed,"
"tired," and "stressed out," that he "fe[lt] the weight
of the institution on [his] shoulders," and that he
feared he could no longer perform his job.  *Id*.  The
captain and warden, rather than heeding his warnings,

promised him a promotion, and told him to "just keep
going." *Id.*

Testimony from Oliver, his family members, and his
coworkers further supported the conclusion that his
offense conduct was driven by his mental illness. Upon
viewing a video of himself beating the two men during
Lieutenant Burks's trial, Oliver broke down and wept,
exclaiming, repeatedly, "I just wish somebody was there
to stop me." Trial Transcript, Vol. II at 140, *United
States v. Burks*, No. 2:19cr344-MHT (M.D. Ala. May 2,
2022), ECF No. 234. Later, Oliver's coworker testified
that she had never before seen Oliver commit an act of
unprovoked violence. *Id.* at 226. And at Oliver's
sentencing, his family members testified that his offense
conduct was entirely out of character. As his wife put
it, "It is not in Ulysses to tear down someone[,] destroy
others[,] or defeat others." Rough Draft Sentencing
Transcript at 19, April 8, 2022. The court found all of
this testimony credible, and took it to indicate that

Oliver, at the time of the offense conduct, was not in his right mind.

### C.

In light of the above evidence, and after considering the factors set forth in 18 U.S.C. § 3553(a), the court determined that a variance was warranted for two reasons.

First, Oliver's PTSD, and its contribution to his offense conduct, diminished his moral culpability. As the court has previously recognized, "in meting out appropriate punishment, the court should make a good-faith attempt to ensure that the defendant is not inappropriately punished for having a disease." *United States v. Mosley*, 277 F. Supp. 3d 1294, 1296 (M.D. Ala. 2017) (Thompson, J.). Thus, the court has granted variances to defendants whose offense conduct was driven by drug addiction, *see United States v. Mosley*, 312 F. Supp. 3d 1289, 1292-95 (M.D. Ala. 2018) (Thompson, J.), and the lingering effects of childhood trauma, *see United*

13

*States v. Carter*, 506 F. Supp. 3d 1204, 1210-14 (M.D. Ala. 2020) (Thompson, J.).  For the same reason, jurisdictions across the country, including in Alabama, have established specialized courts designed to tailor treatment, rather than sentences of incarceration, for veterans whose offense conduct stems from combat-related trauma.  *See id.* at 1210 (citing Jeremiah Glassford, Note, "*In War, There are No Unwounded Soldiers": The Emergence of Veterans Treatment Courts in Alabama*, 65 Ala. L. Rev. 239, 252-55 (2013)).  To the extent that Oliver's conduct was driven by PTSD that he developed while working at ADOC, he is no less deserving of leniency.

Second, the court found that Oliver, while the perpetrator of a heinous crime, was, himself, a victim of neglect by his supervisors and the State of Alabama itself.  The State hired him to maintain order in its prisons, yet failed to provide him with the resources--specifically, the fellow officers--that he

14

needed to do his job safely.  As Oliver explained to Dr. Flanagan, ADOC's correctional officers are asked to care for and supervise more inmates than they can possibly manage, in an environment rife with violence and drug abuse.  Every day that they go to work, they must question whether they will return home safely.  ADOC's understaffing thus has had a profound effect not only on the men and women incarcerated in ADOC's facilities, but also on the men and women who work there.

That Oliver, or any other officer, might have developed PTSD in ADOC's understaffed prisons was entirely predictable.  Indeed, correctional officers across the country have been found to suffer from PTSD at rates equivalent to those of Iraq and Afghanistan war veterans.  *See* Lois James & Natalie Todak, *Prison Employment and Post-Traumatic Stress Disorder: Risk and Protective Factors*, 61 Am. J. of Indus. Med. 725 (2018); *see also* Amy E. Lerman, Univ. of Cal., Berkeley, Officer Health and Wellness: Results from the California

Correctional         Officer         Survey        (2017)

https://gspp.berkeley.edu/assets/uploads/research/pdf/e

xecutive_summary_08142018.pdf (finding that one in three

correctional officers in California experience symptoms

of PTSD, as do one in three combat veterans); Colette

Peters, Nat'l Inst. of Just., Investing in People:

Improving Corrections Staff Health and Wellness (2018),

https://nij.ojp.gov/topics/articles/investing-people-

improving-corrections-staff-health-and-wellness

(finding that one in three correctional officers in

Oregon experience symptoms of PTSD); Caterina G. Spinaris

et al., Desert Waters Corr. Outreach, Posttraumatic

Stress  Disorder  in  United  States  Corrections

Professionals: Prevalence and Impact on Health and

Functioning (2012), https://www.ojp.gov/ncjrs/virtual-

library/abstracts/posttraumatic-stress-disorder-united-

States-corrections (estimating that 27 percent of U.S.

corrections professionals suffer from symptoms of PTSD).

The risk of developing PTSD may be especially great for

16

officers who suffered adverse childhood experiences, including physical and emotional abuse, and parental separation or divorce. *See* Karestan C. Koenen et al., *Early Childhood Factors Associated With the Development of Post-Traumatic Stress Disorder: Results from a Longitudinal Birth Cohort*, 37 Psychol. Med. 181 (2007). And yet, remarkably, the State made no effort to screen Oliver for indicia of mental-health issues or vulnerabilities before or after hiring him. Even when Oliver reported to his captain and warden that he feared he was under too much stress to continue working, they took no action. And, most egregiously, when Oliver engaged the very next day in an act of violence that, his colleagues agreed, was entirely out of character, his supervising lieutenant made no attempt to intervene, instead remarking about the beating, "[I]t's fair." Trial Transcript, Vol. II at 38, *United States v. Burks*, No. 2:19cr344-MHT (M.D. Ala. May 2, 2022), ECF No. 234. By failing to screen Oliver for PTSD, to respond to his

17

request for help, and then, when he could no longer handle
the stress, to stop him from committing an atrocious act
of violence, the State and Oliver's supervisors failed
not only to protect Oliver's victims from Oliver, but
Oliver from himself.

In *United States v. Terry*, 427 F. Supp. 2d 1132,
1141-42 (M.D. Ala. 2006) (Thompson, J.), the court
invoked Mary Shelley's *Frankenstein* to describe the
relative moral culpability of the State of Alabama and a
criminal defendant who had been raised in the State's
custody, with little care or guidance, whom the State
repeatedly prosecuted for conduct typical of a troubled
child and later abandoned, at the age of 18, to a
crime-riddled neighborhood with no means of support.  In
Shelley's novel, it is Dr. Frankenstein, and not the
creature, who commits the greater evil, for he creates
the creature and then abandons it, allowing it to roam
without supervision and do harm both to society and to
itself.  So too was the State, the court found, more

18

culpable than defendant Terry, for it had shaped him by failing to care for him adequately and criminalizing his resulting behavioral transgressions, and had then abandoned him when it was all but inevitable that he would engage in future criminal conduct.

The same analogy fits here.  The State, by subjecting Oliver to a work environment that caused him to develop PTSD, shaped Oliver.  Then, as Dr. Frankenstein did to his creature, it abandoned him.  When he asked for help, it did not provide it; when he snapped, viciously beating helpless men, it turned away.  For that, the State bears significant culpability for the harm that Oliver inflicted on his victims, on society, and, ultimately, on himself.

None of this is to diminish the harm caused by Oliver's actions, or the atrocity of his crime.  In the circumstances of this case, however, the court found that it would be unjust to ignore the effect of his mental

illness on his offense conduct, or to place the full
burden of punishment on his shoulders alone.

### IV.

After granting Oliver's motion for a variance, the
court sentenced him to 30 months of incarceration--seven
months below the bottom of the sentencing range
established by the Guidelines.

In addition to this term of imprisonment, the court
imposed a three-year period of supervised release.  In
her psychological evaluation, Dr. Flanagan recommended
that Oliver receive cognitive behavioral therapy and/or
eye movement desensitization and reprocessing therapy to
treat his post-traumatic stress disorder, and cognitive
behavioral therapy to address his substance-abuse
disorder.  Accordingly, the court ordered the United
States Probation Office to arrange for Oliver to receive
such treatment.  It also ordered, per Dr. Flanagan's

recommendation, that Oliver participate in Alcoholics Anonymous or some similar program.

Since his arrest, Oliver has remained sober and diligently participated in mental-health treatment, and the court is confident that he will continue to do so upon his release from prison. It is the court's sincere hope that, with time and effort, Oliver will be able to heal from the trauma inflicted on him by his time at ADOC.

For all of the reasons discussed above, the court was persuaded that the sentence it imposed was appropriately tailored to the seriousness of Oliver's offense, the circumstances of his conduct and his mental-health history, and the need to provide him effective treatment for his post-traumatic stress disorder and substance-abuse disorder. *See* 18 U.S.C. § 3553(a).

DONE, this the 17th day of June, 2022.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE

21